IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-413

No. COA21-225

Filed 21 June 2022

Bladen County, No. 17 CVS 580

STATE OF NORTH CAROLINA, *ex rel.* ELIZABETH S. BISER, SECRETARY,[1] NORTH CAROLINA DEPARTMENT OF ENVIRONMENTAL QUALITY, Plaintiff,

CAPE FEAR RIVER WATCH, Plaintiff-Intervenor,

v.

THE CHEMOURS COMPANY FC, LLC, Defendant.

Appeal by Proposed Intervenor Cape Fear Public Utility Authority from order entered 30 November 2020 by Judge Douglas B. Sasser in Bladen County Superior Court. Heard in the Court of Appeals 15 December 2021.

> *Attorney General Joshua H. Stein, by Special Deputy Attorney General Francisco J. Benzoni and Assistant Attorney General Asher P. Spiller, for Plaintiff-Appellee State of North Carolina.*
>
> *Southern Environmental Law Center, by Geoffrey R. Gisler, Jean Y. Zhuang, and Kelly Moser, for Plaintiff-Intervenor-Appellee Cape Fear River Watch.*
>
> *Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Joseph A. Ponzi, George W. House, and V. Randall Tinsley, for Proposed Plaintiff-Intervenor-Appellant Cape Fear Public Utility Authority.*

---

[1] Elizabeth S. Biser, who became Secretary of the North Carolina Department of Environmental Quality in June 2021, has been substituted for Michael S. Regan. N.C. R. App. P. 38(c) ("When a person is a party to an appeal in an official or representative capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and the person's successor is automatically substituted as a party.").

*Robinson, Bradshaw & Hinson, P.A., by R. Steven DeGeorge, and Wachtell, Lipton, Rosen & Katz, by John F. Savarese, for Defendant-Appellee The Chemours Company FC, LLC.*

COLLINS, Judge.

¶ 1        Proposed Intervenor Cape Fear Public Utility Authority ("CFPUA") appeals from the trial court's order denying its 8 September 2020 motion to intervene in this environmental action brought in 2017 by the State of North Carolina against Defendant, The Chemours Company FC, LLC.  CFPUA argues that the trial court erred by denying its motion to intervene as untimely, erred by denying intervention as of right, and abused its discretion by denying permissive intervention.  Because the trial court did not abuse its discretion by denying CFPUA's motion as untimely, we affirm.

## I.    Background

¶ 2        Chemours owns the Fayetteville Works facility ("Facility"), a chemical manufacturing plant adjacent to the Cape Fear River in Bladen County, North Carolina.  Chemours produces certain per- and polyfluoroalkyl substances ("PFAS"), including a chemical commercially known as GenX, at the Facility.  The Facility discharges water into the Cape Fear River through multiple avenues.  CFPUA, a public utility authority which provides potable water to residents of New Hanover

County and the City of Wilmington, owns and operates a raw water intake on the Cape Fear River downstream of the Facility.

¶ 3 On 7 September 2017, the State, through the Department of Environmental Quality ("DEQ"), filed a Verified Complaint, Motion for Temporary Restraining Order, and Motion for Preliminary Injunctive Relief against Chemours alleging violations of multiple water quality laws and regulations based on discharges of PFAS from the Facility into groundwater and the Cape Fear River. The State sought a temporary restraining order requiring Chemours to "immediately cease discharging" certain substances "from its manufacturing process into surface waters" and to "continue to prevent the discharge of process wastewater containing GenX into waters of the State." The State also sought preliminary and permanent injunctive relief. The following day, the trial court entered a Partial Consent Order requiring Chemours to continue existing measures to "prevent the discharge of process wastewater containing GenX . . . into waters of the State," immediately prevent the discharge of certain compounds identified in the complaint, and provide certain information to DEQ and the Environmental Protection Agency.

¶ 4 On 16 October 2017, CFPUA sued Chemours in the United States District Court for the Eastern District of North Carolina ("Federal Suit"). *See* Complaint, *Cape Fear Public Utility Authority v. The Chemours Co. FC, LLC*, No. 7:17-cv-195,

(E.D.N.C. 2017), E.C.F. No. 1.[2]  In the Federal Suit, CFPUA and other regional water suppliers and governmental entities assert claims for public nuisance, private nuisance, trespass to real property, trespass to chattels, negligence, negligence per se, failure to warn, and negligent manufacture against Chemours.  Along with the other plaintiffs, CFPUA seeks compensatory damages, punitive damages, and injunctive relief.  *See* Amended Master Complaint of Public Water Suppliers at 6-7, 45-54, *Cape Fear Public Utility Authority v. The Chemours Co. FC, LLC*, No. 7:17-cv-195 (E.D.N.C. 2019), E.C.F. No. 75.

¶ 5        The day after filing its Federal Suit, CFPUA moved to intervene in the present action ("First Motion to Intervene").  CFPUA sought to intervene permissively and as of right under N.C. Gen. Stat. § 1A-1, Rule 24.  CFPUA asserted that it had "an interest in the injunctive relief granted" in this action "to assure that such relief adequately protects CFPUA's interests" and contended that its "ability to obtain relief may be impaired if the State either fails to prevail (in whole or in part) . . . or if the State compromises this underlying action in a manner detrimental to CFPUA."  CFPUA also argued that its interests were "not adequately represented by the State" because its Federal Suit asserted "interests unique to a public water supply authority

---

[2] We take judicial notice of CFPUA's filings in the federal court.  *See State v. Watson*, 258 N.C. App. 347, 352, 812 S.E.2d 392, 395 (2018) ("[O]ur courts, both trial and appellate, may take judicial notice of documents filed in federal courts.").

which are not addressed or protected by the relief sought by the State" and the State's failure to provide public notice and opportunity to comment prior to entry of the Partial Consent Order "call[ed] into question whether the State recognize[d] CFPUA's rights."

¶ 6     CFPUA withdrew its First Motion to Intervene on 15 November 2017 after the parties stipulated that the State would provide notice and comment procedures "with respect to any proposed settlement between" the State and Chemours. The parties also stipulated that the Partial Consent Order was "not a final resolution of any claims asserted" by the State.

¶ 7     On 9 April 2018, the State filed an Amended Complaint and Motion for Preliminary Injunctive Relief containing further allegations based on information gathered during further investigation and seeking additional injunctive relief.[3]

¶ 8     The State published notice of a Proposed Consent Order and commenced a public comment period on 26 November 2018. In a 17 December 2018 comment, CFPUA argued that the Proposed Consent Order was "fundamentally flawed in a number of important respects," including that certain remedial provisions "effectively

---

[3] The requested injunctive relief included requiring Chemours to address air emissions of GenX Compounds, address other sources of GenX Compounds "such that they no longer cause or contribute to any violations of North Carolina's groundwater rules," refrain from discharging process wastewater into the Cape Fear River prior to issuance of a new permit, account for other discharges, and generally "[c]ease and abate all ongoing violations of North Carolina's water and air quality laws."

abandon[ed] the downstream users of the Cape Fear River, leaving them to fend for themselves in private litigation." CFPUA protested that the Proposed Consent Order would provide filtration systems for private well owners whose water exceeded a threshold level of contamination with certain PFAS but would not provide comparable relief for downstream users whose water presented the same level of contamination. In an additional comment, CFPUA provided results of "recent PFAS testing at the CFPUA water intake on the Cape Fear River, and of the treated 'finished' water." According to CFPUA, "out of 51 sampling events" of raw and finished water, only 4 fell below the threshold for private well filtration under the Proposed Consent Order.

¶ 9        CFPUA again moved to intervene on 20 December 2018 ("Second Motion to Intervene"). CFPUA alleged in its Second Motion to Intervene that it was unaware the parties were negotiating or had reached a proposed settlement until the Proposed Consent Order was published. CFPUA contended that the Proposed Consent Order did not "account for or seek to remedy the ongoing harms inflicted on CFPUA and its customers." CFPUA set its Second Motion to Intervene for hearing but removed the motion from the calendar on 10 January 2019.

¶ 10        The State moved for the entry of the Revised Proposed Consent Order on 20 February 2019. The State, Chemours, and Cape Fear River Watch, another

proposed plaintiff-intervenor,[4] each consented. At a hearing on the Revised Proposed Consent Order, counsel for CFPUA requested the trial court withhold entering the order until CFPUA's Board of Directors considered whether it should withdraw the Second Motion to Intervene. The trial court declined to do so and entered the Revised Proposed Consent Order as a Consent Order on 25 February 2019.

¶ 11        The Consent Order obligates Chemours to undertake compliance measures to address air, groundwater, surface water, and drinking water contamination and imposes monitoring and reporting requirements. In addition, Paragraph 12 of the Consent Order establishes a process for amending the Consent Order "to reduce PFAS contamination in the Cape Fear River and in the raw water intakes of downstream public water utilities on an accelerated basis[.]" Paragraph 12 provides that,

> within six months of entry of this Order, Chemours shall submit to DEQ and Cape Fear River Watch a plan demonstrating the maximum reduction in PFAS loading from the Facility (including loading from contaminated stormwater, non-process wastewater, and groundwater) to surface waters . . . that are economically and technologically feasible, and can be achieved within a two-year period . . . . The plan shall be supported by interim benchmarks to ensure continuous progress in reduction of PFAS loading. If significantly greater reductions can be

---

[4] Cape Fear River Watch is a "§ 501(c)(3) nonprofit public interest organization . . . that engages residents of the Cape Fear watershed through programs to preserve and safeguard the river." Cape Fear River Watch filed a motion to intervene on 12 December 2018.

> achieved in a longer implementation period, Chemours may propose, in addition, an implementation period of up to five years supported by interim benchmarks to ensure continuous progress in reduction of PFAS loading. . . . Chemours shall simultaneously transmit the plan to downstream public water utilities. DEQ will make DEQ staff available to meet with downstream public water utilities to receive input on the plan.

Upon reaching an agreement, the parties were required to file a joint motion to amend the Consent Order "to incorporate any agreed upon reductions as enforceable requirements" of the Consent Order. If the parties were unable to reach an agreement within eight months of entry of the Consent Order, they were permitted to either jointly stipulate to additional time or to "bring any dispute regarding the additional reductions before the Court for resolution."

¶ 12    The Consent Order also released and resolved

> civil and administrative claims for injunctive relief and civil penalties by Plaintiff against Chemours relating to the release of PFAS from the Facility that have been or could have been brought based on information known to DEQ prior to the lodging of the original Proposed Consent Order on November 28, 2018 for past and continuing violations of the following statutes and regulations: the Clean Water Act and regulations promulgated thereunder; the Clean Air Act and regulations promulgated thereunder; and the North Carolina statutes and regulations referenced in the Complaint, the Amended Complaint and the [Notices of Violation] . . . . Furthermore, DEQ agrees that, based on information known to DEQ prior to the lodging of the original Proposed Consent Order on November 28, 2018, this Consent Order addresses and resolves any violation or condition at the Facility insofar as it could serve as the

> basis for a claim, proceeding, or action pursuant to Section
> 13.1(a) or (c) of North Carolina Session Law 2018-5.

The Consent Order did not "release[] Chemours from any liability it may have to any third parties arising from Chemours' actions or release[] any claims by any third party, including the claims in" CFPUA's Federal Suit.

¶ 13    Chemours submitted a proposed plan under Paragraph 12 to DEQ on 26 August 2019. CFPUA commented on this submission on 27 September 2019 and met with DEQ to discuss the submission on 30 September 2019. Chemours submitted a revised proposal on 4 November 2019 which "was made publicly available on DEQ's website." Following negotiations between the parties, the State released a Proposed Addendum to the Consent Order for public comment on 17 August 2020.

¶ 14    CFPUA filed a Renewed and Amended Motion to Intervene on 8 September 2020 ("Third Motion to Intervene"). CFPUA again alleged that the Consent Order, and further alleged that the Proposed Addendum, provided disparate standards for groundwater users near the Facility and surface water users downstream of the Facility. CFPUA therefore sought a declaration that the Consent Order and Proposed Addendum were arbitrary and capricious and an abuse of discretion under the North Carolina Administrative Procedure Act, and denied equal protection in violation of the state and federal constitutions. CFPUA also sought a declaration that the violations alleged by the State in its amended complaint have occurred or are

threatened, and the Consent Order and Proposed Addendum failed to abate these violations.

¶ 15    The State moved to enter the Proposed Addendum on 6 October 2020 and filed a corrected motion two days later. The trial court heard CFPUA's Third Motion to Intervene and the motion for entry of the Proposed Addendum on 12 October 2020. The trial court entered the Proposed Addendum as an Addendum to Consent Order Paragraph 12 ("Addendum") following the hearing and an order denying CFPUA's Third Motion to Intervene on 30 November 2020. The trial court concluded that CFPUA's Third Motion to Intervene was untimely and that CFPUA failed to meet the requirements for either permissive intervention or intervention as of right.

¶ 16    CFPUA appealed the denial of its Third Motion to Intervene to this Court.

## II.    Discussion

¶ 17    CFPUA first argues that the trial court erred by denying its Third Motion to Intervene as untimely.

¶ 18    It is well-established that "[w]hether a motion to intervene is timely is a matter within the sound discretion of the trial court[.]" *Hamilton v. Freeman,* 147 N.C. App. 195, 201, 554 S.E.2d 856, 859 (2001); *see also Malloy v. Cooper*, 195 N.C. App. 747, 750, 673 S.E.2d 783, 786 (2009); *Home Builders Ass'n of Fayetteville N.C. Inc. v. City of Fayetteville*, 170 N.C. App. 625, 630-31, 613 S.E.2d 521, 525 (2005). An abuse of discretion occurs only where the trial court's ruling is "manifestly unsupported by

reason" or is "so arbitrary that it could not have been the result of a reasoned decision." *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985).

¶ 19    Both intervention of right and permissive intervention are governed by N.C. Gen. Stat. § 1A-1, Rule 24, which provides:

> (a) Intervention of right.--Upon timely application anyone shall be permitted to intervene in an action:
>
> > (1)    When a statute confers an unconditional right to intervene; or
> >
> > (2)    When the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
>
> (b) Permissive intervention.--Upon timely application anyone may be permitted to intervene in an action[:]
>
> > (1)    When a statute confers a conditional right to intervene; or
> >
> > (2)    When an applicant's claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or State governmental officer or agency or upon any regulation, order, requirement, or agreement issued or made pursuant to the statute or executive order, such officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the

rights of the original parties.

N.C. Gen. Stat. § 1A-1, Rule 24 (2020).

¶ 20        A motion to intervene, whether of right or permissively, must be timely. *See id.*; *State ex rel. Easley v. Philip Morris Inc.*, 144 N.C. App. 329, 332, 548 S.E.2d 781, 783 (2001) (citing N.C. Gen. Stat. § 1A-1, Rule 24).  "Timeliness is the threshold question to be considered in any motion for intervention."  *State Employees Credit Union, Inc. v. Gentry*, 75 N.C. App. 260, 264, 330 S.E.2d 645, 648 (1985) (citation omitted).  In determining the timeliness of a motion to intervene, the trial court must consider "(1) the status of the case, (2) the possibility of unfairness or prejudice to the existing parties, (3) the reason for the delay in moving for intervention, (4) the resulting prejudice to the applicant if the motion is denied, and (5) any unusual circumstances." *Procter v. City of Raleigh Bd. of Adjustment*, 133 N.C. App. 181, 183, 514 S.E.2d 745, 746 (1999) (citing *Gentry*, 75 N.C. App. at 264, 330 S.E.2d at 648). "In situations where a judgment has been entered, motions to intervene are granted only upon a finding of 'extraordinary and unusual circumstances' or a 'strong showing of entitlement and justification.'" *Id.* (citing *Gentry*, 75 N.C. App. at 264, 330 S.E.2d at 648).

### 1. *Status of the Case*

¶ 21        CFPUA argues that the trial court failed to appropriately assess the first factor bearing on timeliness, the status of the case.  CFPUA specifically contends that the

trial court erred because the Consent Order "is not a final judgment, and does not constitute a judgment for purposes of the intervention analysis." We disagree.

The trial court addressed this factor as follows:

> This Court entered judgment in this case in the form of a Consent Order on February 25, 2019, over eighteen months ago. CFPUA's delay must be measured from entrance of this Consent Order. CFPUA was fully aware of the Consent Order. In fact, CFPUA was present in Court on the day it was entered. There are no extraordinary or unusual circumstances that justify CFPUA's long delay. Therefore, this factor weighs heavily against CFPUA and is itself a sufficient basis for denial of CFPUA's Third Motion to Intervene.

(Citations omitted).

The Consent Order contains a comprehensive release of

> civil and administrative claims for injunctive relief and civil penalties by Plaintiff against Chemours relating to the release of PFAS from the Facility that have been or could have been brought based on information known to DEQ prior to the lodging of the original Proposed Consent Order on November 28, 2018 for past and continuing violations of the following statutes and regulations: the Clean Water Act and regulations promulgated thereunder; the Clean Air Act and regulations promulgated thereunder; and the North Carolina statutes and regulations referenced in the Complaint, the Amended Complaint and the [Notices of Violation] . . . . Furthermore, DEQ agrees that, based on information known to DEQ prior to the lodging of the original Proposed Consent Order on November 28, 2018, this Consent Order addresses and resolves any violation or condition at the Facility insofar as it could serve as the basis for a claim, proceeding, or action pursuant to Section 13.1(a) or (c) of North Carolina Session Law 2018-5.

In consideration of this release, Chemours agreed to be bound by the obligations detailed in the Consent Order. The parties thus resolved the State's claims by agreeing to implement the Consent Order, and the trial court retained jurisdiction only "for the duration of the performance of the terms and provisions of [the] Consent Order to effectuate or enforce compliance with the terms of [the] Consent Order[.]"

¶ 24        Citing to the Consent Order's requirement that the parties develop and implement a plan for toxicity studies of certain PFAS, a provision permitting Chemours to request less frequent sampling for certain wastewater and stormwater sampling after two years, and Paragraph 12, CFPUA argues that the Consent Order is not a final judgment. Though these provisions envision approval and enforcement by the trial court, they do not obviate the Consent Order's resolution of the State's claims and therefore do not diminish the Consent Order's effect as a final judgment. Under the release of claims in the Consent Order, there is to be no further adjudication of the merits of the State's claims. *See Duncan v. Duncan*, 366 N.C. 544, 545, 742 S.E.2d 799, 801 (2013) ("A final judgment generally is one which ends the litigation on the merits." (quotation marks and citation omitted)).

¶ 25        The Consent Order in this case is analogous to the consent decree this Court treated as a final judgment when analyzing the timeliness of a motion to intervene in *State ex rel. Easley v. Philip Morris Inc.* The *Philip Morris* consent decree provided for "the creation of a non-profit corporation to control fifty percent of all monies"

received under a settlement agreement, "subject to the North Carolina General Assembly's approval of the creation of the non-profit corporation prior to 15 March 1999." 144 N.C. App. at 330, 548 S.E.2d at 782. Pursuant to the consent decree, the trial court entered a consent order "to create a private trust to benefit tobacco growers and quota owners in North Carolina and other states" and "retained jurisdiction to interpret, implement, administer and enforce the trust agreement." *Id.* at 331, 548 S.E.2d at 782. Approximately ten months after entry of the consent decree and two and a half months after entry of the consent order, the proposed intervenors sought to intervene "on behalf of all North Carolina taxpayers" and filed a proposed complaint in intervention "alleging numerous constitutional and statutory violations in the implementation" of the consent decree and consent order. *Id.* This Court treated the consent decree as a final judgment although it required further action, including the creation and approval of a non-profit; the trial court retained jurisdiction over future proceedings; and payments were to continue for approximately 25 years. *Id.* at 333-34, 548 S.E.2d at 784.

¶ 26        In the present case, the trial court did not err by treating the Consent Order as a final judgment when assessing the timeliness of CFPUA's Third Motion to Intervene. The trial court therefore did not fail to appropriately assess the status of the case and properly required CFPUA to demonstrate "extraordinary and unusual circumstances" or a "strong showing of entitlement and justification" for intervention.

*See Gentry*, 75 N.C. App. at 264, 330 S.E.2d at 648.

### 2. *Possible Unfairness or Prejudice to Existing Parties*

¶ 27        CFPUA also argues that the trial court abused its discretion by concluding that the risk of unfairness or prejudice to the existing parties weighed against the timeliness of CFPUA's Third Motion to Intervene. The trial court addressed this factor as follows:

> CFPUA asserts that "there is no risk of unfairness or prejudice to the existing parties." The Court disagrees. The Court finds that CFPUA's intervention would be highly prejudicial to the existing parties especially given the extraordinary relief that CFPUA seeks—specifically, a trial and a judgment declaring the Consent Order and the proposed Addendum arbitrary and capricious and unconstitutional. Intervention would set back and significantly delay, or even derail, the parties' extensive efforts to reach settlement and address PFAS contamination from the Facility. Indeed, the Court finds that CFPUA's intervention could delay relief for CFPUA's own customers as well as for the many thousands of North Carolinians who stand to benefit from the numerous PFAS reduction measures required in the Consent Order and Addendum. This factor, even taken alone, is sufficient for this Court to deny CFPUA's Third Motion to Intervene.

(Citations omitted).

¶ 28        In its proposed complaint in intervention, CFPUA sought a trial and declaratory judgment that the Consent Order and subsequent Addendum were arbitrary and capricious, unconstitutional, and in violation of DEQ's statutory mandate. Despite the Consent Order's detailed release of the State's claims, CFPUA

also sought a declaration that "the statutory and regulatory violations alleged by the State in this action have occurred or are threatened."

¶ 29        The trial court reasoned that CFPUA's intervention for these purposes would subject the numerous remedial matters addressed in the Consent Order and Addendum, which the trial court found were "the product of years of negotiation as well as time-intensive analysis and investigation involving numerous experts across multiple fields of specialty," to relitigation. The trial court did not abuse its discretion by concluding that CFPUA's intervention "would be highly prejudicial to the existing parties" and this factor weighed against the timeliness of CFPUA's intervention. *See Home Builder's Ass'n of Fayetteville*, 170 N.C. App. at 631, 613 S.E.2d at 525 (concluding that intervention "would prejudice the [existing parties] by destroying their settlement"); *see also Charles Schwab & Co. v. McEntee*, 225 N.C. App. 666, 675-76, 739 S.E.2d 863, 869 (2013) (concluding that the trial court did not abuse its discretion by denying permissive intervention where intervention in the estate dispute "might have eradicated the [settlement agreement] and delayed adjudication of the rights of the Named Parties, potentially to the detriment of the creditors and other beneficiaries of the Estate").

¶ 30        CFPUA challenges the trial court's consideration of "how CFPUA's intervention might interfere with the existing parties' settlement negotiations and decisions" as "untethered to any prejudice which was caused by CFPUA's delay."

CFPUA argues that instead, the trial court should only have considered prejudice to the parties arising from the period between "the date CFPUA learned DEQ would not protect its interests" and the filing of its Third Motion to Intervene, a period CFPUA contends was just 26 days.

¶ 31      CFPUA now asserts that it was unaware DEQ would not protect its interests until DEQ published the Proposed Addendum on 17 August 2020. However, CFPUA alleged that DEQ had failed to adequately represent its interests on multiple instances prior to 17 August 2020. In its First Motion to Intervene, filed 17 October 2017, CFPUA alleged that the State had failed to provide notice and an opportunity for comment prior to filing the original complaint or proposing the Consent Order. CFPUA also alleged that the relief sought would not adequately represent "interests unique to a public water supply authority" such as CFPUA. In an April 2018 memorandum in opposition to a motion to dismiss its Federal Suit, CFPUA argued that DEQ's amended complaint did not seek "relief for third-parties who have suffered injury as a result of the contamination." In its Second Motion to Intervene, filed 20 December 2018, CFPUA declared that it was "clear now that CFPUA's interests are not adequately represented by the State in this action." CFPUA further argued that DEQ had "given little attention to CFPUA's interests in pursuing this enforcement action or to advocating or negotiating relief for the harms caused by the pollutant discharges that are adversely impacting downstream users[.]"

Additionally, as the trial court determined, the entry of the Consent Order on 25 February 2019 placed CFPUA "on notice regarding the requirements for the Addendum." The trial court found—and CFPUA does not contest—that (1) CFPUA commented on Chemours' initial proposal under Paragraph 12 on 27 September 2019; (2) CFPUA met with DEQ three days later, in part to discuss the proposal; (3) Chemours published a revised proposal for compliance with Paragraph 12 on its website on 4 November 2019; and (4) CFPUA again met with DEQ on 17 July 2020. CFPUA's 27 September 2019 comment criticized the proposed addendum as "fundamentally flawed in a number of important respects."

¶ 32        CFPUA's argument that the trial court considered too broad a period in assessing prejudice to the existing parties because CFPUA did not "learn[] DEQ would not protect its interests" until 17 August 2020, and therefore delayed just 26 days before filing its Third Motion to Intervene, is without merit. *See Philip Morris*, 144 N.C. App. at 333, 584 S.E.2d at 783 (noting that while proposed intervenors contended the plaintiff had "failed to represent their interests throughout the process," "information about the underlying case ha[d] been widely available" in the ten-month period between entry of judgment and the motion to intervene).

### 3. *Reason for Delay in Moving for Intervention*

¶ 33        CFPUA also argues that the trial court abused its discretion because it "made no effort to address CFPUA's evidence and argument on the changed circumstances"

that led to its Third Motion to Intervene. To the contrary, the trial court rejected CFPUA's explanation that changed circumstances accounted for its delay in seeking to intervene. In its Third Motion to Intervene, CFPUA argued that the Consent Order was "based on a flawed premise" that "its implementation would result in the continued reduction of PFAS levels in the Cape Fear River." CFPUA contended that data collected after the entry of the Consent Order revealed that "PFAS levels in the Cape Fear River have been variable—not decreasing—and are largely dependent on river flows." Presented with these arguments, the trial court determined that CFPUA had "articulated no legitimate reason for its delay in seeking intervention."

¶ 34 As the trial court noted, the Consent Order put CFPUA on notice of the requirements to which the Addendum had to conform. Paragraph 12 specified that the parties were required to formulate "a plan demonstrating the maximum reductions in PFAS loading from the Facility (including loading from contaminated stormwater, non-process wastewater, and groundwater) to surface waters . . . that are economically and technologically feasible, and can be achieved within a two-year period[.]"

¶ 35 Contrary to CFPUA's argument that changed circumstances justified its delay, the record indicates that CFPUA had a longstanding concern that implementation of the Consent Order would not reduce PFAS levels in the Cape Fear River to its satisfaction. In its Second Motion to Intervene, CFPUA alleged that "even if the

[Facility] immediately ceases all emissions and discharges of PFAS pollutants into the Cape Fear River, those pollutants will continue to contaminate the surface water in the Cape Fear River for decades to come (since pollution in the vegetation, soils, and groundwater in a large and unknown radius around the [Facility] and in river sediments will continue to migrate into the river water through groundwater flow and surface run-off)[.]"  Similarly, in its Federal Suit, CFPUA alleged that contaminants originating from the Facility would be "re-introduced into the waters of the Cape Fear River and be subject to being transported to CFPUA's water intake and introduced into CFPUA's public water supply system" when "disturbed by the natural processes of the river ecosystem, including the normal use of the river by people and water-craft."  *See* Complaint at 22, *Cape Fear Public Utility Authority v. The Chemours Co. FC, LLC*, No. 7:17-cv-195 (E.D.N.C. 2017), E.C.F. No. 1.

¶ 36        The trial court therefore did not abuse its discretion by rejecting CFPUA's changed circumstances theory, determining that CFPUA did not offer a legitimate reason for its delay, and concluding that CFPUA's delay therefore weighed heavily against the timeliness of its Third Motion to Intervene.

### 4. *Prejudice to the Party Seeking to Intervene*

¶ 37        CFPUA also challenges the trial court's conclusion that the potential prejudice to CFPUA of denying intervention weighed heavily against the timeliness of CFPUA's intervention.

¶ 38    The trial court addressed this factor as follows:

> First, CFPUA has its own pending litigation against
> Chemours. As CFPUA acknowledges, the Consent Order
> and Addendum do not in any way impair CFPUA's efforts
> to vindicate its interests in its separate federal litigation.
> To the contrary, the Consent Order expressly provides that
> Chemours is not released from any liability it may have to
> any third parties arising from Chemours' actions. Second,
> with respect to the Consent Order, counsel for CFPUA
> stated in open court that the Consent Order "address[es]
> many of the concerns, if not most of the concerns, [CFPUA]
> initially raised . . . ." Counsel for CFPUA also
> acknowledged that "the requirements of the order are
> beneficial to the public." With respect to the Addendum,
> Chemours is required to achieve maximum feasible
> reductions of PFAS contributions from residual sources at
> the Facility to the Cape Fear River on an expedited basis.
> Downstream communities, including CFPUA and its
> customers, will be the primary beneficiaries of this
> accelerated remediation.

(Citations omitted).

¶ 39    CFPUA argues that the trial court's analysis of the potential prejudice to
CFPUA "fails to consider the changed circumstances" that it contends led to its Third
Motion to Intervene. However, as discussed above, the trial court did not abuse its
discretion by rejecting CFPUA's changed circumstances theory.

¶ 40    CFPUA also contends that its Federal Suit will not provide the same relief as
direct involvement in this action and is "an inferior means to protect [CFPUA's]
interests in prompt and effective remediation of the contamination." The trial court's
analysis, however, did not assume that the Federal Suit would provide the same relief

as CFPUA's intervention. Instead, the trial court reasoned that CFPUA would remain able to pursue its Federal Suit absent intervention and the implementation of the Consent Order and Addendum would benefit downstream users, including CFPUA. CFPUA does not challenge the trial court's findings that the Consent Order "contains numerous provisions to substantially reduce PFAS discharges and emissions to the environment from ongoing operations at the Facility," the Addendum "requires measures to substantially reduce PFAS loading to surface water from historic sources including contaminated groundwater and contaminated soils," and such sources are "currently the most significant source[s] of PFAS loading to the Cape Fear River."

¶ 41          The trial court's assessment that the potential prejudice to CFPUA weighed against intervention is not "manifestly unsupported by reason" or "so arbitrary that it could not have been the result of a reasoned decision." *See White*, 312 N.C. at 777, 324 S.E.2d at 833.

### 5. *Unusual Circumstances*

¶ 42          CFPUA argues that the trial court abused its discretion in concluding that there are "unusual circumstances that warrant denying CFPUA's [Third Motion to Intervene] as untimely." The trial court addressed this factor as follows:

> [T]he "unusual circumstances" that [CFPUA] lists are
> unrelated to its long delay and are irrelevant to its failure
> to timely move for intervention. While extraordinary or

unusual circumstances are generally analyzed to support a late motion to intervene, the Court finds that, here, there are unusual circumstances that warrant denying CFPUA's motion to intervene as untimely. Unlike most settlements, both the Consent Order and the Addendum were publicly noticed, allowing CFPUA and other members of the public a chance to be heard on both documents prior to entry by the Court. CFPUA availed itself of this opportunity and commented on both the Consent Order and the Addendum as well as on Chemours' submission describing how it proposed to comply with the requirements of Paragraph 12 of the Consent Order. Moreover, the Consent Order was unusual in that it expressly provided downstream utilities, including CFPUA, with a unique role in the process that led to development of the Addendum. Specifically, the Consent Order required Chemours to share its plan under Paragraph 12 with CFPUA and other utilities and required DEQ to make relevant staff available to meet with downstream utilities, including CFPUA, to discuss their comments on Chemours' plan. Finally, the nature of this Addendum also constitutes an unusual circumstance favoring the denial of the motion to intervene. The Addendum addresses an issue of paramount importance to the citizens of North Carolina—the requirement of significant reductions of PFAS loading to surface waters from residual sources at the Facility. Intervention at this stage could delay or derail implementation of measures necessary to achieve these reduction[s]. These unusual circumstances weigh against the timeliness of CFPUA's Third Motion to Intervene.

(Citations omitted).

¶ 43        CFPUA does not challenge the trial court's determination that the notice and

comment procedures, CFPUA's involvement under Paragraph 12, and the public

benefit of prompt implementation of the Consent Order and Addendum were unusual

circumstances weighing against CFPUA's intervention. Instead CFPUA argues, as it did in its Third Motion to Intervene, that "unusual circumstances" existed in DEQ's "consistent, carefully considered unwillingness to confer with CFPUA about the remediation measures that DEQ is considering and that directly impact [CFPUA's] customers." CFPUA suggests that this amounts to "conduct by an existing party that makes it more difficult for potential intervenors to apprehend the need to intervene[.]"

¶ 44       In support of this argument, CFPUA cites *Stallworth v. Monsanto Co.*, 558 F.2d 257 (1977), but *Stallworth* is distinguishable from the present case. There, the plaintiff-employees opposed the defendant-employer's request to notify non-party employees of the suit and "give them a reasonable opportunity to intervene, or be joined as defendants[.]" *Id.* at 260-61. The trial court denied the request to notify the non-party employees and subsequently entered a consent order partially settling the case. *Id.* at 261. The non-party employees "first felt the impact" of the consent order ten days later and filed their motion to intervene "just under one month after the entry of" the order. *Id.* at 261-62. The trial court denied the motion to intervene as untimely, but the Fifth Circuit reversed. *Id.* at 260. The Fifth Circuit reasoned that "[s]ince the plaintiffs urged the district court to make it more difficult for the [non-party employees] to acquire information about the suit early on," the plaintiffs should not "be heard to complain that [the non-party employees] should have known

about it or appreciated its significance sooner." *Id.* at 267. The refusal to permit notification of non-party employees of the pendency and potential impact of the lawsuit "constitute[d] an unusual circumstance which tilt[ed] the scales toward a finding that the" motion to intervene was timely. *Id.*

¶ 45 Here, by contrast, the trial court's unchallenged findings of fact demonstrate that CFPUA has long been aware of this litigation, made comments on multiple instances, and conferred with DEQ on several occasions. Additionally, CFPUA's argument that the State's conduct impeded its ability to apprehend the need to intervene is undercut by CFPUA's repeated assertions, beginning early in the proceedings, that the State failed to adequately protect CFPUA's interests.

¶ 46 The trial court did not abuse its discretion in concluding that the unusual circumstances cited by CFPUA are "unrelated to its long delay and are irrelevant to its failure to timely move for intervention," and to the contrary, "there are unusual circumstances that warrant denying CFPUA's" Third Motion to Intervene as untimely.

### III.    Conclusion

¶ 47 The trial court did not abuse its discretion in determining that CFPUA's Third Motion to Intervene was untimely. Because "[t]imeliness is the threshold question to be considered in any motion for intervention," *Gentry*, 75 N.C. App. at 264, 330 S.E.2d at 648, we affirm the trial court's order denying CFPUA's Third Motion to Intervene

without reaching CFPUA's arguments that the trial court erred by denying intervention as of right and abused its discretion by denying permissive intervention under Rule 24(a) and (b).

AFFIRMED.

Judges DIETZ and ARROWOOD concur.